# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| GALLANT DILL and CHASE CLINE, | : : : | **Civil Action No. 22-6116 (SRC)** |
| Plaintiffs, | : : : | **OPINION & ORDER** |
| v. | : : | |
| JARED YELLIN, CILA LABS, LLC, a Delaware limited liability company, CILA INCUBATOR PRIVATE LIMITED, and PROJECT 10K, LLC (f/k/a 10X INCUBATOR, LLC), a Delaware limited liability company, | : : : : : : : | |
| Defendants. | : : | |

**CHESLER**, District Judge

This matter comes before the court on a motion to dismiss counterclaims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) by plaintiffs Gallant Dill ("Dill") and Chase Cline ("Cline") (collectively, "Plaintiffs"). Defendants Jared Yellin ("Yellin"), CILA Labs, LLC, CILA Incubator Private Ltd., and Project 10K, LLC (f/k/a 10X Incubator, LLC) (collectively, "Defendants") oppose the motion. The Court heard oral argument on the motion on March 13, 2024. For the reasons that follow, the motion will be granted in part and denied in part.

## I

The following facts are drawn from the First Amended Answer & Counterclaims, which the Court accepts as true for the purposes of ruling on this motion. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The relationship whose termination preceded this action began in June 2020 when the parties discussed entering an investment partnership. First Amended Answer & Counterclaims, ECF No. 72, at ¶ 43 [hereinafter "Counterclaims"]. Yellin ran CILA Labs, a business ideas incubator that offered software development expertise and business contacts that were attractive to tech entrepreneurs. Dill was the developer of Business Toolkit, a "Software as a Services" ("SaaS") tool that aimed to "help businesses operate and invoice their customers more productively and efficiently." Id. ¶ 43. Defendants allege that Dill sought out Yellin and CILA Labs and that Cline later agreed to provide the $150,000 capitalization to develop Business Toolkit. Id. ¶¶ 43, 48, 58. The parties formed Business Tools, LLC on February 3, 2021 and signed the Amended and Restated Operating Agreement of Business Tools, LLC on June 4, 2021. Id. ¶¶ 44-45, 56.

Over several months, Plaintiffs became dissatisfied with the performance of Yellin, CILA Incubator, and Project 10K (affiliates of CILA Labs) in the development of Business Toolkit. See Counterclaims at ¶¶ 86-97, 110; see also Second Amended Complaint (ECF No. 27) at ¶¶ 107-24 (detailing alleged deficiencies in performance), 90-106 (detailing the involvement of tech entrepreneur Grant Cardone with CILA Labs and the renaming of the former 10X Incubator to Project 10K, LLC). On June 29, 2022, the parties entered into a Termination Agreement ("the Agreement"). Counterclaims at ¶ 107; see Exhibit T to Counterclaims. The parties agreed that the version of the software that existed as of June 29, 2022 would be co-owned but that any further developments would be owned by the respective developing parties. Counterclaims at ¶ 116. Critically for the purposes of the pending motion, the Agreement included a Non-Disparagement Clause:

> After the date of this Agreement and except as may be required by law (including in response to any lawful subpoena), each party agrees that they shall not, and shall cause its affiliates and representatives, not to, directly or indirectly, make any

2

> statements, declarations, announcements, assertions, remarks, comments or suggestions, orally or in writing, that individually or collectively are, or may reasonably be construed as being, defamatory, derogatory or disparaging to the other party or any of their respective affiliates, representatives, officers, directors or employees, or the products or services of the other party

Exhibit T to Counterclaims (ECF No. 72-20) at ¶ 12. After the parties executed the Agreement, Plaintiffs made a series of statements to third parties which form the basis for the counterclaims.

The first set of statements were made via text message on September 7, 2022. Counterclaims at ¶ 120. In a group iMessage text chat with Dill, Cline, and Jarrod Glandt, president of Cardone Training Technologies, Inc. ("CTTI"), "a key business partner and co-owner of Project 10K," Dill and Cline laid out their dissatisfaction with Yellin. Id. Dill and Cline wrote that Yellin "is a complete con artist," never completed their software despite payment of $150,000 and passage of two years' time, incurred another $150,000 in expenses without justification, and was "running a giant Ponzi scheme." Id. They went on to describe how other individuals had similar experiences with Yellin and sent links to dockets in two cases against Yellin before this Court. Id.; see Ghafoor v. Yellin, et al., No. 22-4375 (filed June 30, 2022); SJA TD Holdings, L.L.C. et al. v. Yellin et al., No 22-4940 (filed Aug. 5, 2022). They relayed some other details regarding their experience working with Yellin, expressed shock that Yellin had "snaked himself into y'all's offices," and called Yellin a "delusional dreamer." Counterclaims at ¶ 120.

The next set of statements are a series of alleged contacts between Plaintiffs' counsel and business founders working with Yellin (the "Portfolio Founders"). Counterclaims at ¶ 181. These contacts, though not quoted or presented in the counterclaims, were purportedly of a similar nature to those documented in the September 7, 2022 text messages. See id. ¶ 120. Defendants list six such alleged contacts in their counterclaims, id. ¶¶ 131(a)-(f), and assert that these contacts were "part of [Plaintiffs'] overarching conspiracy and plan to defame and destroy the reputation and

3

business credibility of [Defendants]." Id. ¶ 132. They go on to detail how these contacts allegedly caused, "as a direct and proximate result of [Plaintiffs]' malicious communications," several Portfolio Founders to terminate their business relationships with and caused significant business losses to Defendants. Id. ¶¶ 137-41. Defendants allege that the contacts were made "under the guise of 'investing' in their Portfolio Companies or to 'inquire' about the status of the software development" but were in fact made at the direction of Plaintiffs' counsel and intended to spread negative information about Defendants. Id. ¶¶ 143-44.

The final set of statements involve the publication of a July 2023 online article which discussed Yellin and his investment partnerships. See Exhibit A to Motion to Dismiss Amended Counterclaims, ECF No. 75-2 (hereinafter "HuffPost Article"); see Tom Warren, Financial Influencer Grant Cardone Says He Can Make You A Billionaire. His Investors Claim He Defrauded Them., HuffPost (Jul. 20, 2023, 5:45 AM), https://www.huffpost.com/entry/grant-cardone-financial-influencer_n_64ada368e4b0e87d65574e9b [https://perma.cc/54PM-MNGQ]. Defendants allege that the article was a "defamatory hit piece article" whose publication was solicited by Plaintiffs. Counterclaims at ¶ 146. The article details the activities and business relationships of Grant Cardone, the tech entrepreneur who founded 10X Incubator with Yellin (now Project 10K). See Second Amended Complaint (ECF No. 27) at ¶¶ 90-106. Several paragraphs discuss the various lawsuits that accuse Yellin of "defrauding prospective entrepreneurs by clients, allegedly charging them to have their pitches heard and then billing them for software development projects that were never completed." HuffPost Article at 22. The article discusses various lawsuits brought by Sean Callagy and the Callagy Law Firm, including the case at bar (Callagy Law represents Plaintiffs in this action), as well as the September 7, 2022 text messages. Id. at 23. Four days after its publication, Plaintiffs' counsel posted a series of images on

4

his public Instagram account that contained screenshots from the <u>HuffPost</u> Article, screenshots of the Second Amended Complaint in this case, and a lengthy caption describing his work in representing various plaintiffs against the Defendants in this case. Counterclaims at ¶ 147. Dill shared the article on his public Facebook page as well, and Plaintiffs' counsel made a lengthy comment on the post. <u>Id.</u> ¶¶ 153, 156. Defendants' allegations characterize the article, Instagram post, and Facebook post as part of a "smear campaign" orchestrated by Callagy Law and "carried out with the full knowledge and approval of [Plaintiffs]." <u>Id.</u> ¶ 158. These statements, in sum, allegedly harmed Defendants' "personal and business standing and reputation in the industry" and hampered "their ability to raise funds and the valuation at which they are able to raise funds." <u>Id.</u> ¶ 162.

Defendants also make a claim for indemnification against Cline based on the allegation that Cline misrepresented his status as an accredited investor. Cline signed a Subscription Agreement at the time of his investment in Business Tools, LLC which included a provision affirming that the signatory was an accredited investor. <u>See</u> Exhibit D to Counterclaims at ¶ 6. That same agreement imposes a duty to indemnify "for any loss, cost or expense including reasonable attorneys' fees due to or arising from a breach of any representation or warranty set forth in the Subscription Documents." Counterclaims at ¶ 324.[1] The Omnibus Signature Page to the subscription documents includes a provision stating that the signatory "represent[s] that you are an Accredited Investor and have completed the questionnaire provided by the Company to

---

[1] The Subscription Agreement itself is confidential; Defendants have stated they will produce the Subscription Agreement to the Court *in camera*. <u>See</u> Counterclaims at ¶ 59; Exhibit D to Counterclaims (ECF No. 72-4). For purposes of the present motion, the Court will assume that the quotes and representations regarding the subscription agreement contained in the Counterclaims are accurate.

confirm this status," but Cline checked "no" to every question on the "Accredited Investor Questionnaire Form." Exhibit D to Counterclaims at ¶ 6; Exhibit F to Counterclaims. Defendants allege that Cline thus misrepresented his status as an accredited investor, this misrepresentation led to Cline bringing this lawsuit, Defendants have incurred costs in defending the suit, and Cline must indemnify them for those costs. Counterclaims at ¶ 69.

Plaintiffs initiated this action on October 17, 2022. (ECF No. 1). Defendants moved to dismiss the amended complaint (ECF No. 7) and this Court granted in part without prejudice and denied in part on March 8, 2023 (ECF No. 23). Plaintiffs filed a Second Amended Complaint to cure the defects identified in this Court's first opinion on April 17, 2023. (ECF No. 27). Defendants filed a motion to dismiss, a motion to strike several paragraphs of the Second Amended Complaint, and a motion to award costs as a sanction for multiplying proceedings on May 17, 2023. (ECF No. 28). This Court denied the motion to dismiss, granted the motion to strike, and denied the motion for sanctions on June 23, 2023. (ECF No. 36). On July 20, 2023, Plaintiffs moved to disqualify Becker LLC as counsel for Defendants. (ECF No. 38). After extensive briefing and hearings, Judge Kiel denied the motion to disqualify on October 11, 2023. (ECF No. 60). Meanwhile, Defendants answered the amended complaint and made counterclaims on July 28, 2023 (ECF No. 41), Plaintiffs moved to dismiss on September 5, 2023 (ECF No. 52), the parties stipulated to the filing of an amended answer and counterclaims on October 31, 2023 (ECF No. 65), and the earlier motion to dismiss was administratively terminated on November 2, 2023 (ECF No. 67). Defendants filed their amended answer and counterclaims on November 30, 2023 (ECF No. 72), and the Plaintiffs filed the motion at bar on January 4, 2024 (ECF No. 75). Defendants opposed the motion on February 6, 2024 (ECF No. 79), and Plaintiffs replied on February 13, 2024 (ECF No. 81). The Court heard oral argument on the motion at bar on March 13, 2024.

**II**

Plaintiffs move to dismiss all thirteen counterclaims: (I) breach of contract, (II) civil conspiracy to commit breach of contract, (III) aiding and abetting breach of contract, (IV) breach of the duty of good faith and fair dealing, (V) and (VI) defamation, (VII) civil conspiracy to defame, (VIII) aiding and abetting defamation, (IX) defamation per se, (X) tortious interference with business relations, (XI) civil conspiracy to tortiously interfere with business relations, (XII) aiding and abetting tortious interference with business relations, and (XIII) indemnification.

To withstand a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). Counterclaims must meet the same pleading standards as affirmative claims, and motions to dismiss counterclaims for failure to state a claim are evaluated under the same standards as motions to dismiss affirmative claims. See, e.g., Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 826 (3d Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 556). On a Rule 12(b)(6) motion, the Court must accept as true the well-pleaded facts of a complaint and any reasonable inference that may be drawn from those facts but need not credit conclusory statements couched as factual allegations. Id. at 678. The issue before the Court on a Rule 12(b)(6) motion to dismiss "is not whether plaintiff will ultimately prevail but whether they are entitled to offer evidence in support of the claims." Hickey v. Univ. of Pittsburgh, 81 F.4th 301, 308 (3d Cir. 2023) (cleaned up). "Ordinarily, a court may not consider documents outside the pleadings when deciding a motion to dismiss." Fallon v.

Mercy Catholic Med. Cent. of Southeastern Penn., 877 F.3d 487, 493 (3d Cir. 2017) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)). However, the court may properly consider documents that form the basis of a claim and documents that are "integral to or explicitly relied upon in the complaint." Id. (citations omitted).

### III

The counterclaims surrounding various statements and communications made by plaintiffs to third parties can be grouped into three categories: breach of contract by way of Non-Disparagement Clause violations (Counts One through Four), defamation (Counts Five through Nine), and tortious interference with business relations (Counts Ten through Twelve).

### A

Defendants allege that the Termination Agreement was breached because, in short, Plaintiffs violated the Non-Disparagement Clause. They also allege that Plaintiffs engaged in a civil conspiracy to breach the contract, aided and abetted the same breach of contract, and violated the duty of good faith and fair dealing.

### 1

A cause of action for breach of contract under New Jersey law requires that (1) the parties entered into a contract, (2) the plaintiff performed under the contract, (3) the defendant did not perform under the contract, and (4) the defendant's nonperformance caused damages to the plaintiff. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006); Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016). "It is well settled that courts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (cleaned up). Where the contract's plain meaning is clear and unambiguous, "there is no room for interpretation or

construction and the courts must enforce those terms as written." <u>Namerow v. PediatriCare Assocs., LLC</u>, 461 N.J. Super. 133, 140 (N.J. Super. Ct. Ch. Div. 2018).

The crux of Plaintiff's argument for dismissal on Count One is that the Non-Disparagement Clause could not have been breached because none of the allegedly disparaging comments violated the Clause. Defendants have stated a claim with respect to at least one set of remarks: the publication of the <u>HuffPost</u> Article, which itself contained disparaging statements about Defendants, and associated republications thereof. Defendants allege, with screenshots included in the Counterclaims, that Dill shared the <u>HuffPost</u> Article on his public Facebook page. Counterclaims at ¶ 153. They also allege, again with screenshots in the Counterclaims, that Plaintiffs' counsel Michael Smikun left a detailed comment on Dill's post and made an in-depth post on his own public Instagram page. <u>Id.</u> ¶¶ 148; 156. Accepting these allegations as true, no serious argument could be made that these posts and republications of the article, and the pictures of the Complaint in this matter contained in Smikun's Instagram post, do *not* allege plain-and-simple violations of the Non-Disparagement Clause. True enough, as Plaintiffs argue, that the Counterclaims contain no allegations that Cline himself publicly published or republished any information relating to the litigation or the <u>HuffPost</u> Article, but the Counterclaims allege that Plaintiffs' counsel did so in his capacity as Dill and Cline's lawyer and agent.[2] This is more than

---

[2] Plaintiffs argue that Smikun's posts and reposts of the <u>HuffPost</u> Article cannot serve as a basis for the breach of contract claim as it applies to Cline because of the litigation privilege. This argument fails. The litigation privilege in New Jersey applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation, and (4) that have some connection or logical relation to the action." <u>Allen v. LaSalle Bank</u>, 629 F.3d 364, 369 (3d Cir. 2011) (quoting <u>Hawkins v. Harris</u>, 141 N.J. 207, 216 (N.J. 1995)). In <u>Hawkins</u>, the New Jersey Supreme Court performed an exhaustive analysis of each category of statements to which the litigation privilege applies. <u>Hawkins</u>, 141 N.J. at 216-22. Applying that analysis to Smikun's statements, it is apparent that these statements are not covered by the litigation privilege. The statements were self-evidently not made in a judicial

sufficient to find that Defendants have stated a claim against Cline, as well. On a motion to dismiss, courts must accept all well-pled allegations of fact as true. Iqbal, 556 U.S. at 678. The facts regarding the publication of the HuffPost Article as pled in the complaint unambiguously state a claim for violation of the Non-Disparagement Clause.

Plaintiffs additionally contend that the September 7th text messages cannot be violative of the Non-Disparagement Clause because those statements were made in a private conversation, were not publicly disseminated, and so are not covered by the "commonly accepted" definition of a non-disparagement clause. Their argument relies chiefly on the Appellate Division's recent decision in Savage v. Township of Neptune wherein that Court observed "a non-disparagement clause is a 'contractual provision prohibiting the parties from publicly communicating anything negative about each other.'" 472 N.J. Super. 291, 307 (App. Div. 2022) (quoting Clause, Black's Law Dictionary (11th ed. 2019)).[3] Savage dealt with the enforceability of non-disparagement

---

or quasi-judicial proceeding. "[O]ther participants authorized by law" does not apply because the statements were made outside of a context where conduct could be regulated. Hawkins, 141 N.J. at 220-21 (citing Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 562 (1955)). "Achievement of the objects of the litigation" applies more appropriately to investigations, settlement discussions, and inter-party communications, not publicity surrounding the litigation. Id. at 217-18. Finally, "connection or logical relation" likewise applies not to all statements regarding the litigation, but rather to the proceedings described above. Id. at 218-19. Therefore, the litigation privilege does not apply to Smikun's statements, and these statements can support the counterclaims against Cline.

[3] Plaintiffs cite two other cases in support of this argument. See Plaintiffs' Motion to Dismiss Counterclaims at Section I(A). Neither case is even in the ballpark of support for their argument that the commonly accepted definition of a non-disparagement clause requires offending statements to be made publicly. The first case does not involve a non-disparagement clause at all. Saba v. Am. Family Life Assurance Co. of Columbus, No. 16-9064, 2017 WL 3169056 (D.N.J. Jul. 26, 2017). The statements at issue in the second case were found to be nonactionable because they were not made to a third party, but "publication to a third party" is not the same thing as public dissemination. Benecard Servs., Inc. v. Allied World Specialty Ins. Co., 15-8593, 2020 WL 2842151, at *8 (D.N.J. May 31, 2020); see Publish, Black's Law Dictionary (11th ed. 2019) ("To communicate (defamatory words) to someone other than the person defamed."). Benecard made no statements on the public/private distinction Plaintiffs hang their hat on here.

clauses given the recent passage of N.J. Stat. Ann. § 10:5-12.8(a)—a supplement to New Jersey's Law Against Discrimination "preventing enforcement of nondisclosure agreements in employment contracts or settlement agreements." Savage, 472 N.J. Super at 307. While Savage quoted a legal dictionary definition indicating that non-disparagement clauses apply only to public disparagement, the statements at issue in that case were made publicly, so the Court did not need to address whether private statements might have violated that clause. Id. at 301-02. In any event, the Court only cited the dictionary definition to distinguish non-disparagement clauses from nondisclosure agreements, not to make any ruling on the substance of the statements to which non-disparagement clauses can apply. Savage is neither binding nor persuasive authority for the proposition that a non-disparagement clause by default only applies to public communication. On the contrary, there is no binding authority on New Jersey law that this Court can find for the proposition that a non-disparagement clause in a contract prohibits only public disparagement.

Given the absence of a "commonly accepted" public dissemination requirement, the Court must interpret the Non-Disparagement Clause here as it would any other contractual provision: as the contract is written, absent ambiguity. Namerow, 461 N.J. Super. at 140. The Clause itself reads that signatories or their agents and affiliates shall not "directly or indirectly, make any statements, declarations, announcements, assertions, remarks, comments or suggestions, orally or in writing, that individually or collectively are, or may reasonably be construed as being, defamatory, derogatory or disparaging . . . ." Exhibit T to Counterclaims (ECF No. 72-20) at ¶ 12. There are no caveats or conditions in that provision which require the offending party to make the "defamatory, derogatory or disparaging" comments about a signatory in a public forum. Under this reading of the contract and accepting as true the allegations in the counterclaims, the statements made by Dill and Cline in the September 7th text messages are sufficient to demonstrate

that Dill and Cline made "statements, declarations, announcements, assertions, remarks, comments or suggestions, orally or in writing, that individually or collectively are, or may reasonably be construed as being, defamatory, derogatory or disparaging" to another signatory of the Agreement. Id. Construing the contract in any other way would impermissibly read a requirement into this clause which simply is not present, and nothing in the intent, express terms, surrounding circumstances, or underlying purpose of the contract demands the Court do so. Cnty. of Atlantic, 230 N.J. at 254. "A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument." East Brunswick Sewerage Auth. v. East Mill Assocs., Inc., 365 N.J. Super. 120, 125 (App. Div. 2004). If Plaintiffs wanted the Non-Disparagement Clause to apply only to publicly disseminated statements, they could have bargained for the inclusion of such a condition. Having failed to do so, the Court cannot correct by way of contractual interpretation. The Counterclaims therefore also make out a claim for breach of contract on the basis of the September 7th text messages.[4]

Defendants also base Count One in part on allegations that Plaintiffs spread disparaging information to the Portfolio Founders. The Counterclaims merely includes a list of individuals

---

[4] Plaintiffs stressed at Oral Argument that because Glandt was the president of Cardone Training Technologies, Inc. ("CTTI"), a business partner of Yellin and CILA Labs, the statements made in the September 7th text messages were not made to a third party and therefore cannot serve as the basis for a claim for breach of the Non-Disparagement Clause. Nothing in either the facts as alleged in the Counterclaims or the law as argued at oral argument and in the moving papers support a contention that the statements contained in the September 7th text messages were somehow privileged as a result of the relationship between Glandt, CTTI, and the Defendants. To the extent Glandt/CTTI and Yellin/CILA were business partners, such a partnership is clearly irrelevant in this context, where Plaintiffs were disparaging the latter to the former and this disparagement allegedly resulted in harm to whatever economic relationship existed between the two. See infra Section III(C). At most, whether Glandt/CTTI and Yellin/CILA were business partners is a factual issue inappropriate for resolution at the motion to dismiss stage. Flora v. Cnty. of Luzerne, 776 F.3d 169, 176 (3d Cir. 2015).

with no details regarding the nature of these alleged contacts or what was said. "[J]udicial experience and common sense" prevents the Court from inferring anything more than "the mere possibility of misconduct" with respect to the "Portfolio Founders" allegations contained in Counterclaims ¶¶ 131-45. Iqbal, 556 U.S. at 679. This alone is insufficient to sustain a claim for breach of the Non-Disparagement Agreement, and therefore the Court will dismiss any portion of Count One that relies upon these allegations without prejudice.[5]

Finally, Plaintiffs argue that the Counterclaims do not make a sufficiently specific claim for damages. This argument also fails. "In order to state a claim for damages arising from a breach of contract, a plaintiff must also plead damages resulting from the alleged breach." Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 878 (3d Cir. 1995). To meet the pleading standard set forth under Rule 8 of the Federal Rules of Civil Procedure, plaintiffs alleging damages merely "must provide enough specificity to give defendants notice of their possible damages." Block v. Seneca Mortg. Servicing, 221 F. Supp. 3d 449, 594 (D.N.J. 2016); see also Sheet Metal Workers Loc. 19 v. Keystone Heating and Air Conditioning, 934 F.2d 35, 40 (3d Cir. 1991) ("Rule 8(a)(3) of the Federal Rules of Civil Procedure does not require that the demand for judgment be pled with great specificity."). Defendants have more than cleared this bar with the damages allegations in Count One. They allege a specific dollar amount in lost business, "massive reputational damage," and "loss of goodwill and reputation in the marketplace." Counterclaims at ¶¶ 172-73, 175, 177, 180. Even if a dollar amount were not enough to clear the Rule 8 bar, courts routinely find allegations of reputational damage and loss of goodwill sufficient for damages allegations at the motion to dismiss stage. See, e.g., IDT Corp. v. Unlimited Recharge, Inc., No. 11-4992, 2012 WL 4050298,

---

[5] The Defendants are granted leave to make a motion to amend the Counterclaims should they be able to adequately plead these claims under Iqbal and Twombly.

13

at *9 (D.N.J. Sept. 13, 2012); Syncsort Inc. v. Innovative Routines Int'l, Inc., No. 04-3623, 2005 WL 1076043, at *13 (D.N.J. May 6, 2005).

Plaintiffs' motion to dismiss Count One of the Counterclaims will therefore be granted without prejudice with respect to the Portfolio Founders allegations but denied in all other respects.

**2**

Defendants assert in Count Two that plaintiffs engaged in a civil conspiracy to violate the Non-Disparagement Clause. Civil conspiracy claims under New Jersey law require the plaintiff to plead a viable underlying tort claim. Speedwell, LLC v. Town of Morristown, No. 21-18796, 2023 WL 2207588, at *9 (D.N.J. Feb. 24, 2023) (citing Trico Equip., Inc. v. Manor, No. 08-5561, 2011 WL 705703, at *8 (D.N.J. Feb. 22, 2011); Eli Lilly and Co. v. Roussel Corp., 23 F. Supp. 2d 460, 496 (D.N.J. 1998)). Defendants allege that the plaintiffs engaged in a civil conspiracy to violate the Non-Disparagement Clause. A breach of contract claim is not a tort claim and therefore cannot serve as the predicate for a civil conspiracy claim. Defendants' opposition brief makes no argument to the contrary, citing only a single case which runs against the weight of recent practice in this district. Compare King's Choice Neckwear, Inc. v. Fedex Corp., No. 07-0275, 2007 WL 4554220, at *3-4 (D.N.J. Dec. 21, 2007) with, e.g., District 1199P Health and Welfare Plan v. Janssen, L.P., 784 F. Supp. 2d 508, 533 (D.N.J. 2011); Speedwell, 2023 WL 2207588, at *9; Trico Equip., 2011 WL 705703, at *8; Golden State Med. Supply Inc. v. AustarPharma LLC, No. 21-17137, 2022 WL 2358423, at *11 (D.N.J. Jun. 30, 2022).

Because breach of contract cannot be a predicate for a civil conspiracy claim under New Jersey law, Count Two of the Counterclaims will be dismissed with prejudice.

ar

**3**

Defendants in Count Three allege that Plaintiffs aided and abetted each other's breach of the Non-Disparagement Clause. New Jersey law is unclear on whether aiding and abetting requires a tort-based predicate like civil conspiracy, but resolving the issue is unnecessary today, as Count Three is barred by the economic loss doctrine. The economic loss doctrine prevents plaintiffs "from recovering in tort economic losses to which their entitlement flows only from a contract." Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 562 (D.N.J. 2002). In other words, "a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 280 (2002). The plain text of the Non-Disparagement Clause, the clause whose violation is the predicate for the aiding and abetting claim, squarely addresses the alleged conduct here. The Clause reads that "each party agrees they shall not, *and shall cause its affiliates and representatives, not to*, make any statements . . . ." Exhibit T to Counterclaims at ¶ 12 (emphasis added). Aiding and abetting is effectively a claim that one defendant has "caused" some "affiliates" or "representatives" to do something that harmed the plaintiff. Id.; see also Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 163 (3d Cir. 1973) (enumerating the elements of the cause of action for aiding and abetting under New Jersey law). That conduct is covered precisely by the contract, and absent the contract, there would be no duty to refrain from aiding and abetting a violation thereof.

Because any claim for aiding & abetting breach of the Non-Disparagement Clause would be barred as a matter of law by New Jersey's economic loss doctrine, Count Three will be dismissed with prejudice.

**4**

Turning to the last of Defendants' contract-related claims, Defendants allege that Plaintiffs violated the duty of good faith and fair dealing. Defendants allege that Plaintiffs acted in bad faith by first agreeing to the Termination Agreement in order to obtain rights to the source code and then subsequently violating the Agreement by disparaging Defendants and claiming they were fraudulently induced into signing it. As pled, this claim misses the mark. Every contract formed under New Jersey law contains "an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Wilson v. Amerada Hess Corp., 168 N.J. 236, 245 (2001) (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997) (internal citations and quotations omitted)). Conduct alleged to be violative of the covenant of good faith and fair dealing must be separate and distinct from conduct that would violate an express term of the contract. Wade v. Kessler Inst., 172 N.J. 327, 344-45 (2002); Oravsky v. Encompass Ins. Co., 804 F. Supp. 2d 228, 239 (D.N.J. 2011) (dismissing claims for violation of the covenant of good faith and fair dealing as duplicative of breach of contract claims). Plainly, a violation of the Non-Disparagement Clause is covered by an express contractual provision—the Non-Disparagement Clause. See supra Section III(A)(1). Remarkably, Defendants characterize Plaintiffs' own fraudulent inducement claims as made in bad faith, even though they here attempt to shoehorn what is perhaps a fraudulent inducement claim (e.g., that they were fraudulently induced into entering into the Termination Agreement despite Plaintiffs' intent to violate that same agreement) into a claim for the breach of the covenant of good faith and fair dealing. At bottom, Defendants merely cry foul at Plaintiffs' fraudulent inducement accusation for the benefit of their own in an attempt to get around the Non-

Disparagement Clause. Bad faith though it may be, this is not the sort of extra-contractual conduct which can sustain a cause of action for violation of the covenant of good faith and fair dealing.

Because a claim for breach of the covenant of good faith and fair dealing might stand on some grounds other than those pled in the counterclaims, Plaintiffs' motion to dismiss Count Four of the Counterclaims will be granted without prejudice.

**B**

Defendants allege that they were defamed by Plaintiffs (Counts Five and Six) and that Plaintiffs defamed them as a matter of law (Count Nine) in connection with all three groups of statements—the September 7th text messages, communications with the Portfolio Founders, and the HuffPost Article. They also allege that Plaintiffs engaged in a civil conspiracy to defame (Count Seven) and aided and abetted each other's defamation (Count Eight). Defendants have stated a claim on all five counts.

**1**

To begin, Plaintiffs' argument that the economic loss doctrine bars all five defamation-related counts as a matter of law fails. "[A] tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." Saltiel, 170 N.J. at 280. "If . . . a plaintiff asserts that a defendant breached a 'duty owed to the plaintiff that is independent of the duties that arose under the contract,' the economic loss doctrine does not apply." G & F Graphic Servs., Inc. v. Graphic Innovators, Inc., 18 F. Supp. 3d 583, 589 (D.N.J. 2014) (quoting Saltiel, 170 N.J. at 317). Plaintiff argues that the existence of the Non-Disparagement Clause brings any defamation claim within the ambit of the economic loss doctrine. However, the duty not to defame another is one that exists regardless of any contractual provision—in other words, even without the Non-Disparagement Clause, Dill and Cline would

have had a duty not to defame Yellin and the other Defendants. W.J.A. v. D.A., 210 N.J. 229, 247 (2012) (describing defamation as a "dignitary tort") (citing Swede v. Passaic Daily News, 30 N.J. 320, 331 (1951) ("The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks.")). Therefore, the defamation counts are not barred by the economic loss doctrine.[6]

Turning to the merits, defendants have stated a claim for defamation. To succeed on a defamation claim, a plaintiff must prove that (1) the statement was false, (2) the defendant communicated the false statement to another person, and (3) that the defendant acted negligently or with actual malice in communicating the statement. G.D. v. Kenny, 205 N.J. 275, 293 (2011). "A statement falsely attributing criminality to an individual is defamatory as a matter of law." Id. (citing Romaine v. Kallinger, 109 N.J. 282, 291 (1988)). The Counterclaims allege that, in the September 7th text messages, Dill straightforwardly accused Yellin of committing two crimes: (1) running a Ponzi scheme and (2) committing theft. See Counterclaims at ¶ 120. These allegations are plainly sufficient to state a claim for defamation, and defamation *per se*, as to Dill. Cline, for his part, did not himself write the accusations. But Dill spoke in the third-person plural, on behalf of Cline and himself, in making the accusations. Cline also wrote a message in the three-person group chat in response to Dill's initial message (containing the "Ponzi scheme" accusation) that everything Dill said was "100% accurate." Id. And later in the conversation, Cline reiterated the

---

[6] The irrelevance of the economic loss doctrine here can be distinguished from the Court's application thereof to Count Three, aiding and abetting breach of contract. See supra Section III(A)(3). A duty to refrain from aiding and abetting breach of contract definitionally must flow from the contract itself. If there were no contract, a defendant could not aid or abet a violation thereof. By contrast, although the Non-Disparagement Clause prohibits "defamatory" statements, the duty not to defame does not flow exclusively from the obligations imposed by the contract. Exhibit T to Counterclaims at ¶ 12. Absent the contract, Dill and Cline still would have a duty to refrain from defaming Yellin.

Ponzi scheme allegation in all but name, writing, "[i]t's obvious the entire investment that was made was funding other projects." Id.; see Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 343 n.1 (3d Cir. 2001) (quoting Ponzi scheme, Black's Law Dictionary (7th ed. 1999)). Accepting all of these allegations as true, they are sufficient to sustain claims for defamation and defamation *per se*.

Plaintiffs rely heavily on an unpublished opinion of the Appellate Division, Roberts v. Mintz, No. A-1563-14T4, 2016 WL 3981128 (N.J. Super. Ct. App. Div. Jul. 26, 2016) (per curiam), to argue that, even accepting as true that the accusations were made, Dill's accusations of criminality are non-actionable because they are merely "rooted in frustration with Mr. Dill's experience with Defendant Yellin." Plaintiffs' Motion to Dismiss Counterclaims at 21. At the outset, unpublished opinions of the Appellate Division do not have precedential value and are, at best, persuasive authority. N.J. Ct. R. 1:36-3 ("No unpublished opinion shall constitute precedent or be binding upon any court."). This aside, Roberts is distinguishable from the case at bar. There, the statements were made along with sarcastic quips, exchanges of insults, and in the "Rants and Raves" section of a personal blog website. Roberts, 2016 WL 3981128 at *6-7. The Appellate Division held that "[g]iven the profanity-laden, emotionally-charged context in which defendants used 'grifters,' 'scammed,' and 'fraudulent puppy mill,' a reader would not reasonably understand defendant as charging plaintiffs with a crime or fraud." Id. at *7. Not so here. The messages at issue took place in a personal conversation and without the emotional or profanity-laden language, personal insults, or sarcasm that the Roberts court found critical to dismissing the plaintiffs' claims. Plaintiffs' messages, on the face of them as alleged, were level-headed and well thought-out, containing specific, detailed allegations and even links to pleadings in other court cases. If anything, Roberts hurts Plaintiffs more than helps them; the statements here lack precisely those

19

factors which the <u>Roberts</u> court found dispositive in holding that the statements in that case were not actionable. <u>Id.</u> Indeed, under <u>Roberts</u>, Plaintiffs' messages are sufficient to sustain a claim of defamation *per se*.

Even if Cline's own alleged statements were insufficient to sustain a defamation claim against him, other communications as alleged in the defamation counts apply with equal force to both Dill and Cline. For instance, Smikun was acting as Dill and Cline's agent when he reposted the <u>HuffPost</u> article, shared images of the complaint in this action, and made extensive social media comments on the case at bar. <u>See</u> <u>Hewitt v. Allen Canning Co.</u>, 321 N.J. Super. 178, 184 (App. Div. 1999) ("It is clear that an attorney acts as an agent for his client.").[7] The commentary and posting of the article alone, accepting them as true, are sufficient to sustain a defamation claim— Defendants have adequately alleged that they were false and published with negligence or actual malice—but even if they were not, "the purposeful dissemination of defamatory allegations contained in a pleading, for purposes, of obtaining publicity of the allegation, causes otherwise privileged allegations to lose their protected status when published." <u>Bender v. Smith Barney, Harris Upham & Co., Inc.</u>, 901 F. Supp. 863, 871 (D.N.J. 1994). So, Smikun's alleged sharing of the complaint itself can serve as the basis for the defamation claims against Dill and Cline.

Plaintiffs' motion will therefore be denied with respect to Counts Five, Six, and Nine.[8]

---

[7] For the same reasons discussed above, Smikun's republications, posts, and comments are not protected by the litigation privilege. <u>See</u> <u>supra</u> note 2.

[8] As is the case above, "[j]udicial experience and common sense" prevents the Court from inferring anything more than "the mere possibility of misconduct" with respect to the "Portfolio Founders" allegations contained in Counterclaims ¶¶ 131-45. <u>Iqbal</u>, 556 U.S. at 679; <u>see</u> <u>supra</u> Section III(A)(1). The Court will therefore grant Plaintiffs' motion and dismiss without prejudice any portions of Counts Five, Six, Seven, Eight, and Nine that rely upon these allegations.

**2**

In Counts Seven and Eight, Defendants allege that Plaintiffs engaged in a civil conspiracy to defame and aided and abetted each other's defamation. Plaintiffs assert in their motion that these claims should be dismissed, but the only argument they offer to support this assertion—across both their opening and reply briefs—is that Defendants have not stated a claim for the predicate tort of defamation. See Plaintiffs' Motion to Dismiss Counterclaims at 26. They offer no argument for why these counts should be dismissed even if this Court finds, as the Court indeed has found, that the Defendants have stated a claim for defamation. The Court will therefore assume that Plaintiffs have no argument for dismissal under these circumstances and sustain Counts Seven and Eight. See, e.g., United States v. Schiff, 538 F. Supp. 2d 818, 834 (D.N.J. 2008) ("No legal authority was submitted . . . . Thus, the Court concluded that the Government was no longer pressing its argument."); see also Person v. Teamsters Local Union 863, No. 12-2293, 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013) (collecting cases).

**C**

Defendants allege in Count Ten that Plaintiffs tortiously interfered with their business relationships, and Counts Eleven and Twelve make related claims for civil conspiracy and aiding and abetting tortious interference with business relationships. Defendants have stated a claim for tortious interference, so Count Ten will be sustained, and because Plaintiffs make no argument for dismissal of Counts Eleven and Twelve, those counts will be sustained as well.

Under New Jersey law, "a plaintiff can establish a cause of action for tortious interference with business relationships by showing the following elements: (1) they had some reasonable expectation of economic advantage; (2) the defendants' actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) the interference caused

the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit, and (4) the injury caused the plaintiff damage." Waldman Seafood, Inc. v. Mical Seafood, Inc., No. 12-2054, 2014 WL 2887855, at *7 (D.N.J. Jun. 24, 2014) (citing Printing Mart—Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989)). The plaintiff need not allege the existence of a specific contract, Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co., 912 F. Supp. 747, 772 (D.N.J. 1995), but a mere "assertion that Plaintiff prevented Defendant from raising necessary funds" is "simply too speculative to qualify as a reasonable expectation." Intervet, Inc. v. Mileutis, Ltd., No. 15-1371, 2016 WL 740267, at *8 (D.N.J. Feb. 24, 2016) (quotations omitted).

Defendants' allegations as to intentional interference succeed on the back of Exhibit X to the Counterclaims. See Exhibit X to Counterclaims (ECF No. 72-24) ("Bannan Declaration"). The Bannan Declaration alleges that Jarrod Glandt, head of CTTI and the third party to the September 7th text messages, reneged on a consulting agreement made with Defendants "[a]s a direct and proximate result of the [September 7th] text messages." Bannan Declaration at ¶ 5. More precisely, "CTTI did not hold the marketing events and make the industry contacts as set forth in the Consulting Agreement." Id. Assuming its truth, this allegation easily suffices to clear the first, third, and fourth prongs of the intentional interference test and survive a 12(b)(6) attack: Defendants had a reasonable expectation of economic advantage from the consulting agreement, the September 7th text messages interfered with Defendants' receipt of that advantage, and that interference caused Defendants harm.

While the second prong, malice, requires closer scrutiny, it ultimately presents no object to the intentional interference claim. Malice in the intentional interference context does not literally require ill will but rather "is defined to mean that the harm was inflicted intentionally and without

justification or excuse." <u>Printing Mart</u>, 116 N.J. at 751 (citing <u>Rainier's Dairies</u>, 19 N.J. at 563). In determining whether the conduct was without justification or excuse, "the standard must be flexible and must focus on a defendant's actions in the context of the case presented." <u>Printing Mart</u>, 116 N.J. at 757. The ultimate inquiry is "whether the conduct was both injurious and transgressive of generally accepted standards of common morality or of law." <u>Id.</u> (quoting <u>Sustick v. Slatina</u>, 157 N.J. Super. 134, 144 (App. Div. 1957)). On this score, the context overwhelmingly supports finding that Defendants have sufficiently alleged interference done intentionally and without justification or excuse. According to the allegations in the counterclaims, Plaintiffs reached out proactively to Glandt to inform him about their experience working with Defendants and that several lawsuits had been filed against them. Counterclaims at ¶ 120. Plaintiffs, and their attorney, republished an article (with extensive commentary) detailing negative allegations about the Defendants for the explicit purpose of "bringing fraudsters to justice" and recruiting "victims" of the Defendants' alleged "fraud." Counterclaims at ¶¶ 148, 153, 156. Other allegations contained in the Counterclaims further support this prong of the malice analysis—namely, the list of Portfolio Founders who Defendants allege Plaintiffs contacted with regards to the allegations in this case. Counterclaims at ¶ 131.[9] Additionally, Plaintiffs and Defendants all work in an industry where relationship-building, introductions, and reputation are allegedly paramount currency, and any injury to these assets can directly affect economic opportunities. <u>See</u> Counterclaims at ¶¶ 32-36. Taken together and accepting the allegations in the Counterclaims as true, Defendants have

--------

[9] As is the case above, "[j]udicial experience and common sense" prevents the Court from inferring anything more than "the mere possibility of misconduct" with respect to the "Portfolio Founders" allegations contained in Counterclaims ¶¶ 131-45. <u>Iqbal</u>, 556 U.S. at 679; <u>see supra</u> Section III(A)(1). The Court will dismiss any portion of Counts Ten, Eleven, and Twelve that rely upon these allegations. These facts are, however, relevant to the context-specific analysis required to determine the presence of malice.

adequately alleged that Plaintiffs acted with an intent to interfere with Defendants' business relationships and "without justification or excuse." Printing Mart, 116 N.J. at 751.

Plaintiffs' motion to dismiss Count Ten will therefore be denied. As with Counts Seven and Eight (civil conspiracy to defame and aiding & abetting defamation), Plaintiffs' sole argument for dismissal of the civil conspiracy and aiding & abetting claims in Counts Eleven and Twelve are that the underlying tort claim should be dismissed. They offer no argument for why those counts should be dismissed should the underlying tort claim be sustained. See supra Section III(B)(2). The motion will thus also be denied with respect to Counts Eleven and Twelve.

## IV

Defendants allege in Count Thirteen that Cline has a duty to indemnify based on a false representation that he was an accredited investor. The Counterclaims allege the following, which the Court must accept as true: the Subscription Agreement provides that Cline will indemnify the Defendants for any misrepresentations leading to incursion of costs. Counterclaims at ¶ 324.[10] The Omnibus Signature Page contains a provision stating that the signatory is an "Accredited Investor" and has filled out the Accredited Investor Questionnaire, and Cline signed this form. Id. ¶ 325; Exhibit D to Counterclaims at ¶ 6. Defendants allege that this misrepresentation led to Plaintiffs initiating this suit, which has required Defendants to incur costs in defending it.

Even accepting as true that Cline misrepresented his status, the indemnification claim fails because Defendants do not allege how this misrepresentation caused them to incur costs. A plaintiff naturally causes a defendant to incur costs in defending a lawsuit, but Defendants provide no link from the purported misrepresentation to Plaintiffs' lawsuit. Even if Cline did misrepresent

---

[10] The Subscription Agreement is not in the record, but the Defendants quote the relevant language in Count Thirteen. Counterclaims at ¶ 324; see supra note 1.

24

his status, Defendants make no allegations as to how this misrepresentation led to Cline himself

bringing this suit and in turn causing the Defendant to incur costs. These are precisely the dots that

must be connected for Counterclaim Thirteen to rise above an "unadorned, the-defendant-

unlawfully-harmed-me accusation." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)

(quoting Iqbal, 556 U.S. at 678). The missing link dooms their claim for indemnification.[11]

Count Thirteen will be dismissed without prejudice.

*   *   *

---

[11] The Court does note that the allegations in the Counterclaims concerning Cline's representation of himself as an accredited investor appear to contain internal contradictions. While the Counterclaims allege that Cline and Yellin exchanged text messages wherein Cline expressed that he was not accredited, and Yellin reassured him that the Accredited Investor Questionnaire Form and provision on the Omnibus Signature Page were merely meant to ensure that Cline understood investment risk, the Questionnaire (referenced in the Counterclaims) clearly indicates that Cline was *not* an accredited investor. See Exhibit C to Defendants' Motion to Dismiss; Exhibit F to Counterclaims. This appears to reflect a patent contradiction with Defendants' contention that Cline misrepresented his status by signing the Omnibus Signature Page, which is where Cline ostensibly represented that he *was* an accredited investor. See Exhibit D to Counterclaims. As discussed above, Defendants' counterclaim seeking indemnity based upon this activity by Cline is insufficient to provide an adequate basis to sustain a claim for indemnification. Therefore, the Court need not resolve whether or not the conflicting factual allegations contained in Count Thirteen render the factual basis for that claim implausible under Iqbal and Twombly. See Iqbal, 556 U.S. at 678.

For these reasons,

**IT IS** on this 25th day of March, 2024

**ORDERED** that Plaintiffs Gallant Dill and Chase Cline's motion to dismiss Counts Two, Three, Four, and Thirteen of the Counterclaims (Docket Entry No. 75) is hereby **GRANTED**; and it is further

**ORDERED** that Counts Two and Three of the Counterclaims are hereby **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that Counts Four and Thirteen of the Counterclaims are hereby **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that Plaintiffs Gallant Dill and Chase Cline's motion to dismiss Counts One and Five through Twelve of the Counterclaims (Docket Entry No. 75) is **GRANTED IN PART** to the extent that those Counts rely upon the allegations contained in ¶¶ 131-145 of the Counterclaims; and it is further

**ORDERED** that Counts One and Five through Twelve of the Counterclaims are hereby **DISMISSED IN PART WITHOUT PREJUDICE** to the extent that those Counts rely upon the allegations contained in ¶¶ 131-145 of the Counterclaims; and it is further

**ORDERED** that Plaintiffs Gallant Dill and Chase Cline's motion to dismiss Counts One and Five through Twelve of the Counterclaims (Docket Entry No. 75) is hereby **DENIED IN PART** to the extent that those Counts do not rely upon the allegations contained in ¶¶ 131-145 of the Counterclaims.

    s/Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.

Dated: March 25th, 2024